Good afternoon, Your Honors. Christopher Scarina for Plaintiff and Appellant Homer Jarboe. Mr. Jarboe's 1983 civil rights suit for damages should be allowed to go forward despite an existing conviction because the defendants in this case, I'm saying that his civil rights action should be allowed to proceed despite the existing conviction under PC California PC 148 unless the defendants can show that success in the civil rights action necessarily invalidates or impugns the integrity of that conviction and that is a burden that these defendants cannot show based on the record what we know of what happened in the criminal case. The root of the heck doctrine and that is correct and collateral estoppel principles require that issues be actually litigated and necessarily determined and they'd be the same issues before collateral doctrine will apply. Can several things preclude the application of that doctrine or anything like it in this case? Mr. Jarboe pleaded no contest to a bare-bones allegation of violating California Penal Code section 148. That section prohibits any conduct or act or omission that would inhibit or obstruct or resist or delay a peace officer. We do not know what the state charged Mr. Jarboe with in terms of the specific acts of obstruction, resistance, or delay. Because it was a no contest plea resolved on a plea, there was no actual litigation or determination of what specific acts Mr. Jarboe was guilty of. Do you think Mr. Jarboe's denial of charge? I do, Your Honor. Explain that to me. I worked in the system for a million years and I never saw anything close to this. And if a police department had come in to me and tried to get a 148, I'd have run him out of the office on a rail. Well, Your Honor, I think it could be... Could you get the 711? No. A 148 out of that? It could be construed as obstructing the officer's investigation of a crime. He's giving, if the peace officer believes that Mr. Jarboe is giving him misinformation, he is delaying that investigation. Well, wait a second. If the police officer believes that's the test for obstructing, what if he wasn't at the location that was involved at the 711? How do we know that's false information, by the way? That would be my point. We don't. We don't know what the state had in mind when it charged Mr. Jarboe. But willfully giving wrong information... But you're trying to tell me that the separate act of denial of being at the 711 could have supported a 148. But I don't see what the obstruction is in simply saying, were you at the 711? No. I mean, there's no independence anywhere that he was at the 711 that I could see. Did I miss that? No, you're absolutely right, Your Honor. But that would be the point. We have an incomplete record because it wasn't actually litigated and determined. But you're telling us it could support it, and I don't see how it could, because it doesn't seem that there's anything in here that suggests that was false information. Or doesn't that make any difference? Well, I don't think it makes any difference. There's a practical world. You're telling me that denial of being at the 711 supports a 148 because it's obstruction. So my mind wants to see how it's an obstruction, and I can't find anything that tells me in here that was false. Well, would we agree that giving misinformation to a police officer to delay or confuse the police officer's investigation of a crime would be obstruction? You know, you lie to an FBI agent, you're looking at serious charges. But I'm having trouble finding that this is false information. You want me to read it into the charge somehow, but I find nowhere any place that seems to support that. I'm simply asking you, how do we know it's false or obstruction or an impedance or whatever? Have you got anything else on how the obstruction could have been? Well, there are several acts that we believe could be viewed as obstructing or delaying the officer during the course of that day. The officer commands Mr. Jarbo to come here, and Mr. Jarbo does not. Well, now, temporally, how close is that related to the conduct that you would admit could be covered by a 148? Temporally, that conduct, I submit, would be considered covered by a 148. He's refusing to come here. He refuses to turn around. But isn't that all part and parcel of the actual resistance that we know happened? Well, I don't know that we know actual resistance happened. It is, if you go down to temporal... So if I'm arresting you, excuse me for interrupting, if I'm arresting you and I say, turn around, that's not related to then the act of seizure? Isn't it part and parcel of it? Come here? That sounds like a seizure to me, come here. Well, and the problem that we have is the way the vagueness of that statute, of PC 148, it is so broad that it encompasses all of these specific acts. The problem for you is the time frame is so small. It's under 30 seconds, isn't it? Well, it is a temporally compressed time frame before the shooting. But you can also look at Mr. Jarbo's retreat into the home after the shooting and not coming out of the home despite the efforts of, you know, they called the house, they tried to get him out of the house. Is that what he's pleading guilty to? Well, we don't know, and that would be the point. With a no contest plea, with no factual findings, that would be the point. You cannot tell, and under heck, if it doesn't necessarily impugn the validity of the criminal conviction. Well, that certainly gets you out of that time frame, and I hadn't really thought about that. Well, if your client was told by the officer to come here, is that right? Yes. He called him, huh, when the officer was behind the pickup truck and your client, I think, was on the passenger side? Yes, Your Honor. He called him, and he wouldn't come. He called him a couple of times, and he wouldn't come. Huh? Yes, and he tells him to turn around. And, yeah, told him to turn around. He didn't turn around. Now, is that willfully resist? Yes, Your Honor. I submit that it would constitute a violation of PC-148. And it's not inseparable. It's not inextricably intertwined, as lawyers like to say, from then what happened. It's such a single event, at that point, to come here and turn around. It is a single, it is an isolated time frame. There's no doubt that what happens before the shooting is a compressed time frame, but I would submit that that is, that points to the difficulty of the temporal test, because we are dealing with a vague statute. We're dealing with the temporal test, the time test. I mean, at what point, the temporal test, the time test. I appreciate the court's concern that these events pre-shooting happened in a compressed time frame, but I submit that that may not be the appropriate analysis to look at these interactions between civilians and the police officers, because what constitutes reasonable force and excessive force can change very quickly. What constitutes resistance and not resistance can change very quickly. And the state, who has the ability to charge, and the state has the ability to insist and write on the plea form what exactly they want the criminal defendant to plead to, should bear the burden of doing so. And if they don't, the PC-148 conviction on a no contest plea should not immunize the police for using the excessive force. Well, let's take it out of, let's stop calling it temporal time frame then and call it the continuous conduct rule that California has that does allow these things all to be compressed into one course of continuous conduct. Doesn't this appear to be continuous conduct from that moment on? Come here, turn around, bang, crash? Well, I appreciate the question, Your Honor, because the continuous conduct rule does not have any application here. That rule grows out of a situation where if the police have charged one offense and the prosecution intends to introduce evidence of more than one act, then the criminal defendant is entitled to ask the prosecutor for an election as to what act that prosecutor is relying upon to support the conviction. And this is so you don't have eight jurors finding a defendant guilty of Act A, four jurors finding a defendant guilty of Act B. Aha, we have 12. You're guilty when, in fact, there was no unanimity with respect to any act. Well, Smith didn't see it that way. Smith didn't tell us that's what it was. I mean, I know there was some disagreement in Smith about what it was. Well, are you challenging the legality of the arrest? No. Okay. You're simply saying that we can't tell precisely what it was that he pleaded no-lo to under the 148, and it could have been something outside of the arrest. Exactly, exactly. You're not pleading guilty. You're not contesting the validity of the arrest, but your argument is that excessive force was used, period. Exactly. And so if you're not challenging the validity of the arrest and you're just seeking to recover as to the excessive force that was used, is your argument that that takes you outside of Heck v. Humphrey? Yes, it is, Your Honor. We are not challenging the arrest or the conviction or the sentence. So what three incidents as you describe them, or how many incidents would you like to focus on? In terms of the acts that constituted the one? Denial of being at 7-11? There's a denial of being at 7-11. What was the excessive force used on that? There was none. Okay. There is the refusal to come here, no excessive force associated with that. So now we have two bases for the 148 conviction that don't implicate any use of force. Three, we have the refusal to turn around. Four, if you believe what the deputy and the county has said, there was a gun discharged, though there seems to be no evidence that a gun was discharged, but they say Mr. Jarbo fired a weapon after the deputy ceased firing. There's a noise. A neighbor said he saw him running with a gun. Your client denies that. That is correct. And the neighbor's statement, for the record, is an admissible hearsay. And then there's the action of being in the house, retreating and going into the house and being in the house until approximately 8 that evening. So all of those acts would be either well before or after the deputy's use of the excessive force. Well, I don't know. I mean, to me it seems like a rather simple matter. Your client resisted arrest and not challenging the legality of the arrest, but is just challenging, I mean, he willfully resisted the arrest and obstructed the public officer, the peace officer, in discharging his duties. And so your argument is that excessive force was used. And that's what it is, isn't it? Yes, Your Honor, and it returns. What I'm suggesting is that we return to the roots of collateral estoppel and find out what was actually litigated and necessarily determined. And with this no contest plea on a complaint that simply alleges the elements of the statute, with no facts found, with no trial, you can't determine that. You say you're not contesting the legality of the arrest. What do you mean when you say the arrest? What conduct are you including within that concept? Well, we're not challenging that Mr. Jarba was lawfully arrested when he was at the hospital several days after the incident. You're talking about at the hospital. That would be when he was arrested, yes. Okay, all right. It seems to me the best argument you have is that his escaping into the house was something that could be called resisting arrest. Now, do you want to say a little bit more on California law? It sounds to me as though that were a separate type of offense. He's been shot by the officer, which in effect was an arrest, and then he escapes and barricades him. Is that resisting arrest under California law? I would submit that it would constitute, given the vagueness of that 148 statute and how broad it is, that it certainly could be construed that way. He is inhibiting this officer's ability to complete the investigation and arrest by escaping into the house. When you're shot by an officer, aren't you arrested? I'm sorry, Your Honor, I didn't hear the question. When you were shot by an officer, isn't that the same as an arrest? I don't think that that was. It's a classic seizure. It is a seizure, yeah. Right. Yeah. I do believe that getting shot is a seizure. If we're looking at the lawfulness of the arrest, which happened at the hospital, we're not challenging that. Well, why don't you have a seat and let us hear from the other side. Thank you. Good afternoon, Your Honors. David Lawrence for the athletes in this case. The basis for the district. Have you thought about selling the movie rights? You know, it really is a very unusual set of circumstances, and it kind of demonstrates why police officers have to be on guard all of the time, because Mr. Jarbo did not apparently seem to be dangerous. Did he seem what? He did not apparently. He wasn't apparently dangerous. But, in fact, he had a gun inside of his truck, a loaded .44 Magnum, and he pled guilty or pled no contest to that plea. He had a house full of weapons, including a sawed-off shotgun and ammunition. There was something going on with Mr. Jarbo that I don't think any of us will understand, but it was very dangerous, and Deputy Missel is very lucky to have escaped from that situation without being shot or killed. Now, this case is not about. . . Yeah, but he, you know, he maced him and then ended up macing himself. You know, it's not a perfect science, police work. I mean, he tried to do something less than deadly force. And in the course of that. . . How did he mace someone and mace himself? The wind blew it back into his eyes. The record shows that. It's like a sailor spitting into the wind. Exactly. Doesn't he know that? Well, I would submit, Your Honor, that the deputy at the time isn't thinking, okay, now if Mr. Jarbo does something unusual, the wind is northeast to southwest. I mean, this happens very, very quickly. In fact, District Court Judge Selna said on the record that the pertinent series of events lasted 10 seconds. And if you watch the videotape, that is in fact true. We're talking about a very short sequence of events. Deputy Missel seeing the gun inside of the car, coming back to him, telling him to come here because he was too close to the passenger side of the truck. He didn't do that. He went over to. . . The deputy saw. . . He saw what he thought was a handgun. He saw what he described as a large-bore revolver on the seat of the pickup truck. It was covered with a newspaper or paperback. Correct. Newspaper or paperback. Paperback book. Right. And he pleaded no load with charge of having the gun in the car. Is that right? Exactly. Exactly. A loaded gun in the car. And, in fact, blood was found inside of the. . . Why would they let him plead no load? You'd have to ask the district attorney about that. But I think this is what happened, having been a prosecutor myself at one time. Mr. Jarboe suffered serious injuries. He had a lot of medical attention. He was in the county jail or in their custody during that period of time, and he got sentenced to a year in jail. There was only one felony count that was charged, which was possession of the loaded firearm in the gun, and that was reduced to a misdemeanor on the plea. The rest of the charges he pled to, including resisting, delaying, or obstructing deputy missile, not the deputies who came later during the barricade situation in his home, but the charging document itself says resisting, delaying, or obstructing deputy missile. And his only involvement. . . Can you say that again? The charge is what? The criminal complaint on the resisting charge says that the plaintiff resisted, delayed, or obstructed deputy missile on the date in question. And he wasn't on the scene when the man got into the house, right? After the shooting, deputy missile was taken away from the scene. So this is. . . I mean, I completely agree with you. The 7-11 doesn't go anywhere. Now that you explain the crawling into the house, that doesn't go anywhere. We're down to this very narrow time frame, and the question is can you divide that up again? I'm not sure you can. I think that's slicing it too thin. I think if we dissect this matter of seconds the way appellant's counsel would like to, it essentially does away with Heck v. Humphrey. But isn't the real issue here whether there was an excessive use of force? No. I mean, you know, he. . . The way I picked up on this was that the deputy tried to effectuate an arrest. This party here, Jabot, he didn't come over there and put his hands behind his back, allowed himself to be handcuffed. He didn't come when the deputy called him, and he called him several times. The deputy was trying to mace him, and apparently he turned around and the deputy activated that macing device, but then the wind blew it in the deputy's eyes. And then the deputy was somewhat blinded, but thought that he saw this Jabot open the passenger side of the car, and then the officer just fired, what, 12 rounds? I think it was actually 16 rounds. Sixteen rounds. They get that many in one magazine? Yes. Okay, well. . . He fired six rounds at the plaintiff, and then as he was retreating, he was firing to keep the plaintiff from coming up and shooting him. Shooting him. Right. But he didn't see a gun or anything like that. The record does not. . . He did not see the gun in Mr. Jabot's hand, but it was recovered in the home with blood on it and an expended round under the hammer. And if you listen to that. . . If you watch the videotape, that louder bang from a gun is not seconds after the deputy stopped shooting. It's probably within a second of Deputy Missile's last shot, and it's a very different sound. Well, and there was this. . . Wasn't there another officer that came running over there as a backup, tripped, and there's some evidence that that officer's gun went off? There's some discussion of that on the transcript. That wasn't developed in the record. There were no depositions taken about that, but. . . Are you saying there's no evidence in the record on that? No, there's. . . The transcript of discussions between Deputy Missile and Deputy McClintock is in the record, and Deputy McClintock says something about dropping his gun and it going off, but that couldn't have happened within a second after Deputy Missile fired. Isn't this a jury question? No, because the reason summary judgment was granted is because of Heck v. Humphrey, and contrary to what Appellant Counsel says, it's not collateral estoppel. It doesn't have to be fully litigated. This is a doctrine of consistency in judicial rulings, and. . . Well, I mean, you can have consistency. There's the arrest itself that was, whenever that took place, there's no question about its legality. I mean, they're not challenging the arrest. They're just saying that excessive force was used. I understand that. But that means it didn't call for a hail of 14 bullets. That's what they're saying. So why isn't that a disputed issue of fact? It ought to go to a jury. Because the crime of resisting, delaying, or obstructing includes an element that the officer was acting lawfully within the course of his duties.  So you say that in every case where there's an excessive use of force, that unless that matter goes to trial and the defendant is absolved, criminal defendant is absolved, that they precluded from filing a 1983 federal civil rights action. No, not at all. And this Court's cases have recognized a distinction between this case, where you have a very short period of events, and a case like Smith v. Hammett, for instance, where the plaintiff is claiming, after being handcuffed, that excessive force is used. Smith was one of those cases. Another one was not coming to mind. But the distinction... Well, that's excessive force after an arrest took place. That's right, but that would be the same. It would be a Section 1983 claim alleging excessive force. It would be a Fourth Amendment claim. And the opinions in this Court recognize that, for instance, if a deputy arrests somebody, handcuffs them and puts them in a car, and then sprays them with O.C. spray or hits them or something like that, clearly the fact that they may have pleaded to the resisting arrest is not going to preclude a claim for excessive force. So it depends on the relationship between the events giving rise to the conviction itself. What did he plead to here? He pleaded to resisting, delaying, or obstructing deputy missile in the course of his duties on the day of the incident. And that series of events is very limited, 10 seconds at most. So he did do all that. Right. But then he suffered how many bullets hit him? I think he had 11 wounds. 11 wounds. So isn't that a question for the prior effect as to whether his sustaining 11 wounds was use of excessive force? I don't think so. Because if he pleaded guilty to, because in such a way as to establish that what deputy missile did was lawful, then to allow him to go forward would imply that it was unlawful, and that's what heck bars, is that right? Exactly. The problem is we can't figure out in this case what it was all about, because 148 is very broad. The precise conduct wasn't mentioned. It just says deputy missile. You've got this time period. You have no factual basis that spells out what it is. I mean, there's a sort of an abstract factual basis, but no precise one. So we don't know exactly what we're dealing with. That's the problem. I think if deputy missile had had more extended contact with the plaintiff, I would agree with Your Honor. But his involvement with Mr. Jarboe is very brief. He then leaves the scene. And the charging document, for instance, with regard to the handgun in the car, it specifies that. With regard to the sawed-off shotgun, it specifies that. With regard to hit and run, it specifies that. And with regard to the resisting, delaying, or obstructing, it specifies that it was relative to deputy missile, not to the SWAT team, not to anybody else that was involved there. Well, I asked you about the deputy whose gun went off. How soon did he appear on the scene? I'm not sure. It is probably within a minute of the shooting. That sound is on the videotape. That was a pretty prompt response. Well, if that was a deputy's gun going off, I mean, if you watch that videotape, the big boom and a .44 Magnum makes a big boom, is not even a second after deputy missile stopped shooting. So you don't think it's the, you think it's fairly clear it's not the second police officer? I think it's abundantly clear, because prior to the shooting, no deputy would have any reason to come running up with a gun. Up to the shooting, all they knew was they had found Mr. Jarboe, and he was the person who had been involved in the hit and run. So he wouldn't have had a gun out of him. But wasn't all this broadcast? I mean, it was taped. Yes. And the people at the station could hear it, right? Well, it depends on what you're talking about. They could hear this confrontation. When did that tape recorder go on? I think what we're listening to are the radio communications and the audio of the video camera that was in the police car. When did he call for backup? He called for backup just probably within a second or two of Mr. Jarboe starting to resist. Okay, so he called for backup. Right. And then what happened after that was all communicated to the station, wasn't it? I'm not sure everything. I mean, he said there was a weapon involved. The deputy missile identified very early the fact that he saw a large-bore revolver on the seat of the pickup truck. But this whole separate sound of a gunshot is really a red herring in this case, because the issue here is, does the plea— Wasn't there a witness that said they saw the other deputy come running over there, trip over, and, well, I know it said dropped a weapon, but the weapon went off? No. There's no evidence that the deputy's weapon went off at all? Well, there's two questions. There's no witness who testified to seeing that on the transcript of the discussions right after the shooting between Deputy Missile and Deputy McClintock. Deputy McClintock says he dropped his weapon. And it went off. And it went off. Right. But that's why I'm saying— Why don't we have jury questions here? That's really what I don't understand. Because, first of all, it's not a pleasant experience. I've done a lot of these trials for a deputy to sit there and go through trial. And this is a case where it should not go to trial. The plaintiff pled NOLO to this charge. He pled to everything. Having the loaded gun in his truck, having a sawed-off shotgun, resisting delaying or obstructing, hit and run. What hit and run did he plead guilty to? What statute? No, what hit and run? At the 7-Eleven. It doesn't say 7-Eleven. It just says hit and run. That's why I'm like, which one? There was not any separate event, so it had to be the event at the 7-Eleven. It had to be, but once again it doesn't specify. Well, the cases from this circuit have not required It was sloppy work done by whoever drafted that complaint. Well, the DA didn't care about the civil case. They're not drafting it with the notion of a Section 1983 claim in mind. Well, if they don't, they should. Well, but you're not allowed to extort somebody by your criminal filing into a civil settlement either. That's a conflict of interest. I think it's abundantly clear. Isn't it usually the practice, if you're going to let someone plead, you have them stipulate the probable cause and all the rest of it? That was stopped in 1974, and we created conflicts between the city attorney and the district attorney because the city attorney has a conflict. If it's trying to extort a plea out of somebody and say, if you sign, we'll dismiss the case, then it's out. And that was rule, wait a minute, that's an abusive power. Judge Trott had his first trial before me in 1965, and he's been educating me ever since. We were taught, I mean, but that was what I, you know, I mean, I don't remember much about the 60s, the 70s, the 80s, but going back to those days. Well, this is a little bit off the point, but we were taught, do not use a criminal case to disable somebody civilly. Deal with the criminal case as the criminal case, and don't try to use it to make sure they can't sue the police. Yeah, I remember that was common practice. Yeah. It was, it was. You stipulate that you won't sue anybody and we'll let you plead to a misdemeanor. Yeah, that was. That was stopped in the 1970s. That right, yeah. By the court? There was some, well, we did it unilaterally. We found out the courts had a problem with it because we agreed with the courts. Well, I was, I left the state court system in 67, so anyway, and then things fell apart after that. So do you, you know, I mean, you've got some interesting precedent in this court, and if I remember correctly, Judge Pregnanson was involved in some of it. How do you distinguish the cases that the other side relies on, just by the time frame and the fact that it was all tied up into one ten-second ball of wax? Is that the distinction between Smith and? Essentially, Smith involved a situation where the ultimate plaintiff did not come to the officers who were requesting him. He went into the home. He then came out. They then arrested him, but the record showed that they, they alleged, the plaintiff alleged that a dog was used to bite him on three separate occasions after that. So that is a series of events that lasted over a substantial period of time, and they were discrete events. The same is, same is true with regard to Sanford versus Motts. In that case, the plaintiff claimed that she was punched in the face after being handcuffed. So those cases are clearly distinguishable from this case, because they involve separate events that could be the basis for the plea. But there's no requirement that there be an actual transcript of a factual basis put on the record. The acts by Smith include twice refusing to take his hands out of his pockets, reentering his home once, repeatedly refusing to put his hands on his head, come down off the porch, and finally refusing to put his hands on his head and turn around. Each of these acts constitute a violation of 148 sufficient to warrant the filing of criminal charges. But the case, the case also says that the complaint was based upon, after those events that Your Honor just read, having the dog bite him on three separate occasions. So that was, I mean, those are cases where, that I think, I understand the root of those cases. If an arrest is made and a person resists and he pleads to the resisting arrest, that should preclude the excessive force case. But if the force takes place after the basis for the charge, that's a whole different ball of wax. And those cases, Sanford and Smith, demonstrate that distinction. This case is more like Cunningham. It's more like Nuno. It's more like Tron versus Orange County. Those cases involved a discrete series of events that are one sequence that's uninterrupted. If there are any further questions, I'd be glad to answer them. I do have one other question. We've got this case floating around in California, Yount. What does that have to do with our resolution to this? My memory fails me with regard to Yount. Maybe if you prompted my memory, I might recall it. Well, Yount criticizes, among other things, Smith. And it says the case presents the following issue. Must the defendant who entered a plea of no contest to a charge of obstructing peace officers in the course of their duties, 148, and who had engaged in a continuous course of conduct involving multiple acts of obstruction, any one of which would have supported the conviction, have the conviction invalidated in order to bring a civil rights claim, including the use of excessive force by the officers in the course of taking him into custody? Only a lawyer could write that question. But, I mean, it seems like it's in the ballpark of what we're talking about here. It is in the ballpark. And the California Supreme Court has that up for consideration, as far as I can tell. I think the answer to that is this court in Cunningham talked about the temporal scope of the events. The California Court of Appeals in Tron versus Orange County talks about the unbreakable chain of events. So that's the distinction. These cases that do not apply a heck have a significantly distinct series of events, any one of which could be the basis for a charge. In this case, a district attorney wouldn't charge a plaintiff or a criminal defendant with obstruction because he doesn't turn around. And then a separate count because he doesn't put his hands behind his back. And then a separate count for each physical movement that's made. At some point, we have to put a line on either side of these events and say, this is one uninterrupted sequence of events. I assume you want us to focus on the language in Cunningham that says, here, however, there was no break between Cunningham's provocative act of firing and the police response. So because there's no break, the response was a natural consequence, and his conviction forecloses his excessive force claim. That's the language that you think is dispositive. That's correct, Your Honor. And another case to discuss is that a California case is Tron, T-R-U-O-N-G versus Orange County. Yeah, Orange County Sheriff's Department, which is in plenty of trouble right now, I guess. That's unfortunate. Okay. A lot of the logic sort of escapes me. And that's challenging the legality of his conviction, because he was a police officer. He pled guilty to them. And so I don't see how a 1983 action, if he's successful in that on excessive force, is somehow going to invalidate the conviction. It won't invalidate the conviction. It would draw it into question. If a jury found for the plaintiff, they would have to find that the officer was not acting lawfully. An element of the 148 charge is that he was acting lawfully. Your point is he's already admitted in the NOLO plea that it was lawful, so it couldn't be excessive force. Right. But it's not the admission. It's the conviction that matters under the HEC analysis. Well, it sounds good, but there's some gap in there. And, you know, I still don't understand why a NOLO plea was allowed here, but you're telling me because he was shot up so badly and spent all that time in the Orange County Jail that they wanted to give him a break? I'm not so sure about giving him a break, but I can... Let him plead NOLO. I mean, I can count on one hand the number of NOLO pleas I've taken. Having been a prosecutor... I know. I think that sometimes prosecutors take policy consideration, and one of them is if you go to trial on some charges with Mr. Jarbo and he goes to prison, the state's going to have to provide all this medical care until he dies, because he's significantly disabled. So I can surmise that may have had something to do with the plea. Those kind of things come into consideration in charging. Well, it's really not a matter of saving money. We're guessing. Exactly. Is it necessary to send him to prison? Jarbo was a practicing lawyer when all this went down? Well, he was practicing out of his home, and I think he had one case... He was a contractor. Yes, but his deposition, which is not part of the record, was that he had one or two cases going on. So he was not employed by anybody else, and he did not have a significant source of income. What does his rap sheet show? He had no prior arrests or convictions. I mean, this was an unusual case. But this also was someone who had a lot of weapons and ammunition in his home. He was carrying a loaded .44 Magnum in his truck. There was something going on with him. Lots of people have weapons in their homes and carry them and all that. Every red-blooded American needs a couple of handguns. Plus a sawed-off shotgun. But that was filed later. Well, he's not a nice guy. Thank you, Your Honor. What do you do with Cunningham, the language that I read, so that you could hear it and then answer me? I would direct the Court's attention to Judge Fletcher's discussion of that and his dissent in Smith v. City of Hemet, where he says that the analytical focus of the case was actually the factual events that happened, where in Cunningham the defendant provoked a police shooting, and he was convicted of the felony murder. He then tried to say that there was excessive force, but he had been already convicted of provoking the police shooting, and those two are logically inconsistent. It was the one event of the shooting that led to the death of his partner in crime, as it will, that he was guilty of. But you're not contesting the arrest later in the house, but you are contesting Missle's seizure or attempted seizure of your client in the field. I am submitting that shooting him 11 times was excessive, yes. But to my point about the house, I think Mr. Lawrence answered quite successfully, didn't he? Well, there's nothing in the record to indicate when Deputy Missle left. I mean, Deputy Missle was on scene for a while. We know that from the videotape and his deposition. I mean, he was engaging in conversation with other officers on the scene. Yeah, but he wasn't engaged with your client, so how could it be? Because my client retreated, and that would be the act of resisting that he's retreated into the house, but Deputy Missle's still on scene. I had a couple of questions which may not be answered in the record. There's been some suggestion that the plaintiff has some mental problem. Is that in the record at all? There's nothing like that in the record at all, Your Honor. He was a practicing lawyer. He had an office out of his house. There's no history of mental illness, mental treatment that he was undergoing at the time. And did Missle know him? I mean, it's a small town. No, no. In Missle's deposition, he says that not aware of any danger with Mr. Jarbo, not aware of any danger in that neighborhood. This was 3.30 in the afternoon on a sunny day in San Clemente. What was he doing with a sawed-off shotgun? The shotgun was, I don't know if this is in the record, but it was a gift to him by his father. He grew up in Indiana and he's had that shotgun all his life. The old gift from your father, the old sawed-off, the hand-me-down sawed-off shotgun. Tell me what of his injuries now. Well, he's type 2 diabetic from the loss of the pancreas. He's lost part of his spleen. He lost part of his finger. He's totally disabled physically. Well, that's not the result of the shooting. Yeah, yeah. Oh, yes. He was shot 11 times, yes. All of his medical problems today relate to the shooting. So the shooting developed into a diabetic condition? Yeah, I believe that was the damage to the pancreas led to the onset of the diabetic condition. I would like to call the Court's attention again to the fact that this was a no-contest plea, and under the California Penal Code, a no-law plea, and any admissions required by the Court during any inquiry it makes as to voluntariness or factual basis of the plea, cannot be used against the defendant as an admission in any civil suit. Heck doesn't involve that at all. Heck just looks at the fact of the conviction. But what I'm submitting, though, Your Honor, is heck requires you to look at the underlying facts. Just like this Court did in Smith, look at the underlying facts. And to use the heck bar in this case is using that no-law plea as an admission for the underlying facts. It requires you to look at the legal facts involved in the conviction, which is somewhat different from the historical facts. Man, a no-law is tantamount to a guilty plea. I think the judge told him that, didn't he? He did, but there's direct law on point, Your Honor, that a no-law plea in a Mr. Meener case is not to be used against him. Well, it's not being used against him. I mean, he's the one that's bringing the lawsuit. If the no-law plea is used against him to deny vindication of his civil rights, then I submit that it is being used against him. You submit that, but he's not the one being sued. Okay. The other side of the coin is he is the one that was shot 11 times. So that's the other side of that coin. Was your client's deposition taken? Yes, it was. And what reason did he give for turning away from the officer when the officer, or refusing to come to the officer when the officer called him? I think he was concerned about the officer's demeanor. I don't know that there was much of a reason beyond that. The officer just looked a little bit intense, and it got worse from there. I think what you had is a situation here where the officer scared him, and things got out of hand. Was there a weapon on the seat of the car? My client says no, Your Honor. Well, he pleaded no-law to that, too. He pleaded no-law to that. There's no question about that. That was a felony? Yes. And now he denies that there was a gun in the car? Yes. After being shot 11 times and experiencing the prison medical ward, he'll take the plea to get out of jail. Was there any damage to the front of his car? None that the deputy testified to. We asked him about that in his deposition, and he said that he found no damage to the front. So he still denies the hit-and-run, too? And the deputy found no evidence of it, yes. But someone got his license number and a good description of the car. Yes, that's correct. Some witness called and said that this vehicle was in it. Now, whether or not that witness reported accurately or not, we don't know. We know there was no physical damage to the truck. He got the color, he got the description of the vehicle and the license plate. And was there any damage to the other car? I don't know that that's in the record. I don't know. But there were no paint transfers or anything like that? That's correct. Are you familiar with Yount? Yes, Your Honor. I am aware that it is before the Supreme Court. And I believe the Yount case provides a framework for analyzing it that I think may be appropriate and consistent, certainly consistent with Heck. And that is you analyze what happened in terms of the conduct of the suspect. You analyze the excessive force that is claimed, and you determine if there was a conflict between the two. And that the analysis focuses not so much on the clock, if you will, but on the acts. So what was done here, what actually transpired. And if it is necessarily the case, and if the defendants prove that it is necessarily the case, that success in the 1983 action would impugn the integrity of the criminal conviction. Only then, only then does Heck bar the case. Should we wait for Yount before we do something? I mean, they could come out with a completely different test. Well, I think this Court is certainly... We know the California courts don't like Smith. They've said that. Well, it brings up an issue on a couple of the state court cases that were referenced by Appellee's Counsel. In Trung, for example, Trung is different because there was an actual plea and a statement, a fact. There's a factual recitation of what the act was. So Trung is different on those grounds. In terms of whether or not the Court should wait to see what the state court of California does, I don't believe that's necessary. I think the Court is well within its purview to decide this question. Was anything in the deposition about the passenger's, you know, the door of the passenger's side of the pickup truck being locked or unlocked? Well, Deputy Missell, in his deposition, I asked him, did you try to... I mean, you're telling me there's this weapon in the truck. Did you try to take control of that weapon? And he said, I did. And what did you do? Tried the door. What happened? He said it was locked. Yeah, that's what he said. That's what he said. So now I have, there's a civilian and he's standing in his driveway and the deputy thinks he sees a weapon. The deputy doesn't mention that he's seen the weapon. Doesn't put himself, another interesting part about the case, the deputy doesn't put himself between the zone of danger and the citizen. No, but the citizen was on the passenger's side. That's right. And the deputy... And he was worried about it, so he called him to come to the back. And the guy wouldn't come. Interesting, the path that the deputy took to get to the citizen. You would think that the deputy would walk around the front of the truck and then come down the driveway and now he's put himself between the citizen and the... Well, if he goes around the front of the truck and comes down, my client's at the rear of the truck. If he goes around the front of the truck and comes down, he's now put himself between the zone of danger, if you will, and the citizen. So the deputy's in a better position. You know, that's what we always do. We try to intellectualize these things in the calm of a courtroom. And when it's happening in 10 seconds, the deputy would have, if the deputy would have been saying, I better check the wind before I use the mace, they wouldn't think about the wind either. No, I appreciate that. No, I understand. What did the deposition show as to whether the passenger side was locked or unlocked? I don't think there was any testimony on that. The deputy said that he tried the driver's side door and it was locked. How about the other side? He didn't try that door. There was no testimony on whether or not that passenger door was locked or not. He wasn't asked one way or another whether he tried that door? I don't recall. I just don't recall, Your Honor. What did you say? I don't recall. Both windows were up and both doors were closed. What year was the truck? It was, oh, goodness. Do you open the doors with a clicker or a key or who knows? I don't know that there's a record on that. I don't know. All right, thanks. Thank you, Your Honor. Okay, now we'll go to the last matter on our calendar. Weinstein, Eisen, and Weiss v. Gill.
judges: Pregerson, Noonan, Trott